**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 12 CR 491-5 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| KAMAL PATEL, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Dr. Kamal Patel was charged with six counts of violating the "Anti-Kickback Statute," 42 U.S.C. § 1320a-7b(b)(1)(A), and one count of conspiracy to violate the Anti-Kickback Statute, 18 U.S.C. § 371, in connection with his acceptance of payments from a home health care company. Defendant voluntarily waived his right to a jury trial, [109], and proceeded to a bench trial, which began on June 10, 2013. At the close of the Government's evidence on June 11, 2013, Defendant moved for judgment of acquittal on all counts pursuant to Federal Rule of Criminal Procedure 29(a). [111]. Defendant contended that the Government failed to prove that he had "referred" patients to the home health care company within the meaning of the Anti-Kickback Statute. See [112]. The Court took Defendant's motion under advisement, (Tr. 387, June 11, 2013), set a briefing schedule [117], and proceeded with the remainder of the trial The Court grants both parties' motions for leave to file oversized briefs. [121], [122].

After carefully considering all of the parties' submissions (including supplemental briefing on an Eleventh Circuit case that was decided after trial), [112]; [121-1]; [122-1]; [155]; [156]; [160]; [161], the evidence adduced at trial, and the parties' stipulations [124], the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Crim. P. 23(c).

To the extent, if any, that findings of fact, as stated, may be considered conclusions of law, they should be deemed conclusions of law. Similarly, to the extent that matters expressed as conclusions of law may be considered findings of fact, they should be deemed findings of fact.

In the end, the Court concludes that the Government established beyond a reasonable doubt that Defendant knowingly and willfully "referred" patients to a home health care provider in exchange for remuneration and conspired with others to do so. Accordingly, the Court finds Defendant guilty of the charges in the indictment and denies Defendant's motion for judgment of acquittal [111]. This matter is set for status on March 14, 2014 at 10:00 a.m.

## I.     Findings of Fact

Home health care companies deliver health care services to homebound patients at their residences. (Tr. 20, 41, June 10, 2013). There are approximately 700 home health care companies in Cook County, Illinois. (Tr. 20, June 10, 2013; Tr. 308, June 11, 2013). Of those, approximately 10-20 regularly provide home health care to Defendant's patients. (Tr. 399, June 11, 2013). Grand Home Health Care ("Grand") falls into both of those categories. (Tr. 20-21, 40-41, June 10, 2013; Tr. 307, 399, June 11, 2013). At all relevant times, Grand was owned and operated by Nixon Encinares and Maria Buendia. (Tr. 22, 41, 224-25, June 10, 2013). Approximately 95% of Grand's patients are Medicare beneficiaries. (Tr. 47, 236, June 10, 2013). The parties have stipulated that Medicare is a federal health care program as defined by Title 42, United States Code, Section 1320a-7b(F). (Tr. 20, June 10, 2013).

Grand experienced a significant decline in business in 2002 or 2003 when some of its partners left to form a competing home health care company, Romyst, and took 80% of Grand's patients with them. (Tr. 61, 241-42, June 10, 2013; Tr. 482, June 12, 2013). After the schism, Grand's remaining principals, Encinares and Buendia, amped up their efforts to market Grand's

services. (Tr. 62, June 10, 2013). Encinares and Buendia visited numerous doctors, including Defendant, to introduce themselves and attempt to drum up business for Grand. (Tr. 62-64, 243-44, June 10, 2013; Tr. 482, June 12, 2013). Grand's first visit to Defendant proved unsuccessful; none of his patients came to Grand in the ensuing month or so. (Tr. 64-65, 245, June 10, 2013). Grand's similar efforts to solicit business from other doctors and hospitals also were largely unavailing. (Tr. 243, June 10, 2013).

At some point in 2003 or 2004, struggling Grand began offering to pay doctors and other health care providers for Medicare patients. (Tr. 53, June 10, 2013). Defendant, an internal medicine specialist who treats approximately 20 elderly patients per day and prescribes home health care services to about 10 patients per month, was among the physicians that Encinares and Buendia propositioned in this regard. (Tr. 63-64, 171, 245-46, June 10, 2013; Tr. 393, 399, 460, June 11, 2013; Tr. 476-77, 479-80, 484, 491, 505, June 12, 2013). Encinares expressly proposed paying Defendant for "referrals." (Tr. 65-66, June 10, 2013; Tr. 493, 532, 534, June 12, 2013). Defendant testified that he did not say anything in response to the proposal and "didn't agree with" Encinares. (Tr. 492, 497, June 12, 2013). Government cooperators Encinares and Buendia testified that Defendant said something like, "okay," or "yeah." (Tr. 64, 66, 247 June 10, 2013).[1] After Encinares and Buendia offered to pay Defendant on a per-patient basis during their second

---

[1] Given the lapse of time between the initial meetings involving Encinares, Buendia, and Defendant and the trial – approximately 9-10 years – and the witnesses' understandably vague recollections of the conversation, the Court does not have much to work with in regard to resolving the factual dispute concerning Defendant's response (or lack thereof) to Encinares's offer. It is not necessary to make a credibility finding as to that conversation, for even if the Court were to accept Defendant's testimony that he did not verbally indicate his agreement to participate in the charged conspiracy at the initial meeting, his actions in accepting payments from Encinares while certifying and recertifying patients to Grand manifested his involvement in the charged criminal conduct. See, *e.g.*, *United States v. Larkins*, 83 F.3d 162, 166 (7th Cir. 1996) ("[T]he government need not establish a formal agreement to conspire. The jury properly may find an agreement to conspire based on circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct." (citation and quotation omitted)); see also *United States v. King*, 627 F.3d 641, 651-52 (7th Cir. 2010).

meeting with him in 2004 or 2005, Grand began providing home health care services to about 2-4 of Defendant's patients per month.  (Tr. 66, 185, 245-47, 250, June 10, 2013; Tr. 301-02, June 11, 2013; Tr. 484, 498, June 12, 2013).   This amounted to less than five percent of Defendant's patients, (Tr. 486, June 12, 2013); the majority of them continued to use other providers, primarily Northwest Community Hospital, for home health care services. (Tr. 481-82, June 12, 2013).

To qualify for Medicare-paid home health care services, a patient must be homebound and have a medical condition or constellation of medical conditions that requires skilled nursing care or therapeutic services.  (Tr. 47-48, June 10, 2013; Tr. 479, 504, 516, June 12, 2013).  A doctor or nursing facility makes the initial determination that a patient needs home health care services.  (Tr. 52, June 10, 2013).  Once that determination is made, the patient or his or her caregiver must select a home health care company to furnish the necessary services.   (Tr. 409, 411, June 11, 2013).   When home health care patients are released from hospitals or rehabilitation centers, staff at those facilities sometimes discuss with the patients which home health care provider will best meet their needs.  (Tr. 38, 142, June 10, 2013; Tr. 480, June 12, 2013).  Patients who previously have received home health care services often reselect their previous provider.  (Tr. 39, June 10, 2013; Tr. 402, June 11, 2013; Tr. 481, June 12, 2013). Defendant did not personally discuss with patients or their family members which home health care providers they should use, either as an initial matter or as part of recertification.  (Tr. 406, 412, 415, 418, 429, 431, 441, 454, June 11, 2013; Tr. 481, 485, 487, June 12, 2013). Defendant's patients discussed home health care companies with his medical assistant, Jeanette Sungvoom.  (Tr. 501, June 12, 2013).  Defendant did not tell Sungvoom which home health care provider that patients should use.  (Tr. 407, 412, 418, 485, June 11, 2013), even after Grand

began paying him. (Tr. 487, June 12, 2013). Sungvoom gave patients, including June Osgood, an array of 10-20 brochures for various home health care companies and let the patients select which company they wanted to use. (Tr. 409-11, 416-17, 434, 437, 440, 446, 453, June 11, 2013). The brochures were provided to Defendant's office by the home health care companies they featured. (Tr. 409, June 11, 2013).

To initiate the provision of home health care for first-time recipients or recipients whose previous periods of usage had long expired, Sungvoom, acting under Defendant's authorization, would call or fax the selected home health care company (including Grand) with the name of the patient, his or her diagnosis, and his or her Medicare number. (Tr. 66, 189-90, June 10, 2013; Tr. 411, 413, 435, 443, June 11, 2013). The fax cover pages from Defendant's office bore the subject line "new referral," (Tr. 135-36, June 10, 2013; Tr. 424, June 11, 2013; Tr. 518, June 2 Govt Ex. A), and the faxes themselves contained prescriptions for home health care signed by Defendant or by Sungvoom with his authorization. (Tr. 137-38, 211-12, June 10, 2013; Tr. 421, 425, 447, 463, June 11, 2013; Tr. 520, June 12, 2013; Govt. Exs. B, C, D). Sometimes, these initial communications would come directly from the hospital or other facility at which Defendant's patient was located. For instance, on July 29, 2009, Northwest Community Hospital, a hospital with which Defendant was affiliated, faxed to Grand a "New Referral" for patient Marie Corso, who had used Grand in the past. (Tr. 145, 213, June 10, 2013; Tr. 303-04, 455, 461, June 11, 2013; Def. Ex. 1). Sometimes the "Referral Form" completed by Grand after it received a phone call from one of these facilities would list as the "source" of the patient a "nursing home," as for Defendant's patients Marie Corso and Josephine Zaccaria, (Tr. 145, 149-50, 153-54, 157, 160-61, June 10, 2013; Def. Ex. 2, 5, 9), or a "hospital," as for Defendant's patients Olimpia Dato and Jill West. (Tr. 146-48, June 10, 2013; Def. Ex. 3, 4). Regardless of

where the patient came from, however, Defendant's authorization was required to effectuate the initial admission to Grand. (Tr. 38, 189, 190-91, 204, June 10, 2013).

After Grand received one of these phone calls or faxes, it would send one of its nurses to assess the patient and complete an "OASIS" form documenting the assessment. (Tr. 165, 202-03, June 10, 2013; Tr. 314, June 11, 2013). The nurse or someone else at Grand would then complete a "Form 485," a standardized Medicare form that certifies that home care is medically necessary and outlines a patient's diagnosis, medications, treatment plans, and goals. (Tr. 24-25, 67, 167, June 10, 2013; Tr. 299, 315, June 11, 2013; Tr. 506, June 12, 2013). Grand devised the proposed treatment plans contained on the Form 485, but it would have to get the treatment plans approved by and the Form 485 signed within 30 days by a doctor – the patient's primary physician – before it could bill Medicare for any services rendered. (Tr. 48-49, 165, 202-03, 214, 235, June 10, 2013; Tr. 315, 462, June 11, 2013; Tr. 488, 502-03, June 12, 2013). Grand could (and did) provide the proposed services before the Form 485 was signed – it is not unusual for two to four weeks to elapse between the OASIS assessment and the signing of the Form – but if the primary physician did not ultimately approve the Form 485 Grand could not bill Medicare for the services rendered. (Tr. 48-49, 166, 214, 235, June 10, 2013; Tr. 488, 502-03, June 12, 2013). Defendant's signature on each Grand-prepared Form 485 expressly certified or recertified that "the patient is confined to his/her home and needs intermittent skilled nursing care, physical therapy and/or speech therapy or continues to need occupational therapy," and that he has "authorized the services on this plan of care and will periodically review the plan." (Tr. 506-07, June 12, 2013; Govt Ex. April 5, 2011 Documents). However, nothing on the Form 485 indicated whether the signing physician personally discussed with the patient whether he or she should seek services from a particular home health care company. (Tr. 38, June 10, 2013; Govt

Ex. April 5, 2011 Documents).

Encinares met with Defendant on a monthly basis to have him sign Form 485s and give him money. (Tr. 67, June 10, 2013; Tr. 502, 541-42, 544, June 12, 2013). Encinares and Defendant were the only participants in these meetings.[2] (Tr. 467, June 11, 2013; Tr. 533, June 12, 2013). Defendant understood that Encinares wanted him to send Medicare patients to Grand and accepted $400 for each Form 485 representing a new admission to Grand and $300 for each recertification. (Tr. 69, 246, 252, June 10, 2013; Tr. 507-09, 514, 527, 533, 537, 539, 552, June 12, 2013). Defendant was paid for signing the forms regardless of whether he personally told the patients to use Grand. (Tr. 178, June 10, 2013; Tr. 287, June 11, 2013; Tr. 509, June 12, 2013). That is, he was paid "for every, every patient" of his that was admitted to Grand "because he had to sign the 485." (Tr. 287, 304, June 11, 2013). Defendant would have signed the Form 485s for these patients even if they had not selected Grand, (Tr. 489, 510, 544-46, 551, June 12, 2013), but on at least one occasion he indicated that he was not ready to sign the forms ("paperwork") for patients who selected Grand until Encinares was able to bring cash along with the forms. (Tr. 109-10, June 10, 2013; Tr. 545-46, 549-50, June 12, 2013; Govt Ex. Phone Calls, Grand-18).

Encinares and Defendant did not typically discuss the payments over the phone because they both feared that they would be overheard. (Tr. 68, June 10, 2013; Tr. 547, 556-57, June 12, 2013). Buendia, however, kept in her office a handwritten record of Defendant's patients and Grand's payments to Defendant in notebooks or ledgers. (Tr. 71, 248-49, 252-53, June 10, 2013; Tr. 323, June 11, 2013; Govt Exs. Notebook 1-5). She and Encinares would refer to the

---

[2] Because Sungvoom was not present for those meetings, her testimony (Tr. 466-70, June 11, 2013) to the effect that Defendant did not take any money and Grand never offered any money is entitled to minimal weight. While she may not have seen any transactions involving money and "paperwork," the video recordings played at trial confirm that such transactions did take place, although there is no evidence that she saw them. In fact, one of the video recordings shows that Defendant himself was looking to make sure that no one – including Sungvoom – saw him take a money-filled envelope from Encinares. See Govt Ex. May 16, 2011 Video.

notebooks each month to determine how much money Defendant was due. (Tr. 250-51, June 10, 2013). The notebooks contain entries reflecting payments to "Dr. Patel" of $1,100 on September 26, 2007, (Tr. 263, June 11, 2013; Govt Ex. Notebook 1), $1,100 on March 11, 2008, and $1,100 on June 1, 2010. (Tr. 269, June 11, 2013; Govt Ex. Notebook 5). Defendant does not contest and indeed offered to stipulate that he received the amounts of money indicated in the notebook entries for "Dr. Patel" and "Dr. P." (Tr. 264-65, June 11, 2013). The September 26, 2007 entry is annotated with "S (2)" and "R(1)," indicating that the $1,100 payment on that date was composed of two $400 payments for new or "start of care" admissions and one $300 payment for a recertification. (Tr. 263, June 11, 2013; Govt Ex. Notebook 1). The June 1, 2010 entry is similarly annotated, with "SOC(2)" and "R/C(1)." (Govt Ex. Notebook 5; Def. Ex. 13). The March 11, 2008 entry is not. (Govt Ex. Notebook 1). The notebooks also contain additional entries pertaining to Defendant and his patients. (Tr. 263-72, 327-33, June 11, 2013). They do not contain entries recording Defendant's "repayment" of an $8,000 loan he received from Grand, (Tr. 273-74, June 11, 2013; Tr. 489, June 12, 2013); while that loan was outstanding, Grand compensated Defendant in incremental loan forgiveness rather than cash payments. (Tr. 273, June 11, 2013).

The Government began investigating Grand for health care fraud in spring 2011. (Tr. 21, June 10, 2013). On March 15, 2011, federal agents executed a search warrant at Grand's offices, (Tr. 21-22, June 10, 2013), and recovered the notebooks. [124] ¶ 2. Approximately one week later, Encinares and Buendia agreed to cooperate with the Government's investigation. (Tr. 22, June 10, 2013). Federal agents asked Encinares and Buendia to record telephone calls and meetings with individuals, including Defendant, to whom they had been paying kickbacks. (Tr. 22, 230, June 10, 2013; Tr. 308-09, June 11, 2013).

After Encinares began cooperating with the Government, he recorded several phone conversations and three meetings that he had with Defendant. The three recorded meetings were "typical" of meetings Encinares had with Defendant prior to that point. (Tr. 133-34, June 10, 2013). The parties have stipulated that each of the recordings submitted as Government exhibits are true and accurate copies of consensually recorded telephone conversations, that they accurately reproduce both the words spoken and the sounds of the speakers' voices as those words were spoken and as those sounds occurred in the original conversations, and that the phone calls occurred on the dates and times listed on the transcripts that correspond to the recordings. (Tr. 86, June 10, 2013; [124] ¶ 1).

On April 4, 2011, federal agents recorded a telephone call between Encinares and Defendant. (Tr. 23-24, June 10, 2013). During that call, Encinares and Defendant scheduled a meeting for the next day, April 5, 2011. (Tr. 23, June 10, 2013; Tr. 541, June 12, 2013; Govt Ex. Phone Calls, 2011-04-04). Prior to the scheduled meeting, three federal agents met with Encinares to prepare Encinares for the meeting. (Tr. 23, June 10, 2013). Although the agents forgot to search Encinares for money or contraband at this time, (Tr. 25, June 10, 2013), they equipped him with a recording device and an envelope containing $1,600 in cash before following him to Defendant's office. (Tr. 24, June 10, 2013). In addition to the $1,600, Encinares took unsigned Form 485s and telephone orders to the meeting. (*Id.*). Telephone orders are alterations or additions to Form 485s. (Tr. 25, 67, 194, June 10, 2013; Govt Exs. E, F, G, H, I, J). They also must be signed by a doctor but, like the Form 485s, are prepared by home health care nurses. (Tr. 67, 166-67, June 10, 2013; Tr. 457, June 11, 2013).

The April 5, 2011 meeting between Encinares and Defendant lasted approximately 30 minutes. (Tr. 26, June 10, 2013). During the meeting, Encinares told Defendant that Grand

needed more patients, and Defendant responded "I'm doing it, okay." (Tr. 98, June 10, 2013; Tr. 557, June 12, 2013; Govt Ex. April 5, 2011 Video). Defendant signed new-admission Form 485s for patients Imogene Cook, June Osgood, Maria Petrovich, and Josephine Zaccaria. (Tr. 92-96, June 10, 2013; Govt Ex. April 5, 2011 Documents). He also signed a telephone order for Imogene Cook. (Tr. 93-94, June 10, 2013; Govt Ex. April 5, 2011 Documents). After Defendant signed the paperwork, Encinares gave Defendant the $1,600. (Tr. 97, June 10, 2013; Govt Ex. April 5, 2011 Video). Defendant grabbed the envelope containing the money, folded it, and put it in his pocket. (Tr. 97, June 10, 2013; Govt Ex. April 5, 2011 Video; Govt Ex. April 5, 2011 Still Shots).

Federal agents did not search Encinares for money or contraband after the meeting, but they did retrieve from him the recording device, the signed Form 485s, and the signed telephone order. (Tr. 26, June 10, 2013). To verify that Encinares had given the $1,600 to Defendant, the federal agents arranged for Encinares to telephone Defendant the next day. (*Id.*). During that call, Encinares told Defendant that he (Encinares) erroneously had paid a different doctor an incorrect amount of money and asked Defendant to confirm that he (Defendant) had received the correct amount. (Tr. 27, 104-06, June 10, 2013; Govt Ex. Phone Calls, 2011-04-06). Defendant asked if he could call Encinares back, (Tr. 29, June 10, 2013), and did so a few minutes later. (*Id.*). Defendant's call to Encinares was not recorded because federal agents did not want to arouse Defendant's suspicions. (Tr. 30, June 10, 2013). During that phone call, which agents standing by overheard, Defendant seemed nervous but confirmed that he had received the correct amount. (Tr. 31, 105-07, June 10, 2013). Defendant mentioned to Encinares that future conversations about their financial relationship would have to take place in Defendant's office. (Tr. 31, June 10, 2013).

The next recorded call between Defendant and Encinares took place on May 10, 2011. (Tr. 107, June 10, 2013; Govt Ex. Phone Calls, Grand-18). Encinares initiated the call by returning a previously made but unrecorded call from Defendant. (Tr. 107, June 10, 2013). During the call, Defendant said, "I was wondering if we could meet for paperwork today," which Encinares took to mean Defendant wanted to get together to sign Form 485s and telephone orders and also that "he needs the money at that time." (Tr. 108, June 10, 2013; Govt Ex. Phone Calls, Grand-18). Defendant did want Encinares to bring him money at that time. (Tr. 545-46, June 12, 2013). Encinares tried to postpone the meeting because money was "tight" for Grand, to which Defendant responded, "so you're not ready for the paperwork right now." (Tr. 109-10, June 10, 2013; Tr. 549-50, June 12, 2013; Govt Ex. Phone Calls, Grand-18). Defendant eventually agreed to meet with Encinares the following Monday, May 16, 2011. (*Id.*)

Before the May 16, 2011 meeting, federal agents met with Encinares. (Tr. 32, June 10, 2013). They searched him and his vehicle and provided him with a recording device and an envelope containing $1,000 in cash. (Tr. 33-34, 110-11, June 10, 2013). Encinares took the recording device, cash, and some Form 485s and telephone orders into Defendant's office. (Tr. 35, June 10, 2013). Defendant and Encinares were the only people present at the meeting. (Tr. 110, June 10, 2013). Encinares provided Defendant with – and Defendant signed – Form 485s recertifying patients Josephine Zaccaria and Maria Petrovich, and a Form 485 newly admitting patient Marie Corso. (Tr. 112-14, June 10, 2013). In exchange, Encinares gave Defendant the agent-provided $1,000: $400 for the new admission and $300 for each of the recertifications. (Tr. 114-15, 118, June 10, 2013; Tr. 537-39, June 12, 2013). At some point during the 35-40 minute meeting, (Tr. 35, June 10, 2013), Defendant "looked nervous" and looked toward the door. (Tr. 116-17, June 10, 2013; Govt Ex. May 16, 2011 Video). Defendant was nervous about

accepting the money, (Tr. 539, June 12, 2013), and was concerned about accepting money every time he did so. (Tr. 547, 554, 556, June 12, 2013). After Encinares gave Defendant the money, saying, "1,000 for the patients there," Defendant made "a shushing signal with his finger," which prompted Encinares to lower his voice. (Tr. 117, June 10, 2013; Tr. 538-39, June 12, 2013; Govt Ex. May 16, 2011 Video). Agents searched Encinares and his vehicle after the meeting and retrieved from him the recording device and signed Form 485s. (Tr. 36. June 10, 2013).

Federal agents directed Encinares to call Defendant again on June 2, 2011. (Tr. 119, June 10, 2013). Encinares was supposed to set up another meeting with Defendant, but the call ended abruptly when Defendant stated that he heard a beep on the line. (*Id.*; Govt Ex. Phone Calls, 2011-06-02). Encinares testified that Defendant became "nervous and suspicious" after purportedly hearing the beep and told Encinares that he would call back. (Tr. 119-20, June 10, 2013). Encinares could not remember whether Defendant actually called back, but he and Defendant met again at Defendant's office on June 8, 2011. (Tr. 120, June 10, 2013; Tr. 551, June 12, 2013). Before the meeting, agents searched Encinares and his vehicle, outfitted him with a recording device, and gave him an envelope containing $800 in cash. (Tr. 121, June 10, 2013; Tr. 310, June 11, 2013). During the meeting, Defendant signed two Form 485s for patient Lillian Serviss and a third for patient Gino Romozzi. (Tr. 123-25, June 10, 2013). Encinares only paid Defendant $800, however, because one of the forms for Lillian Serviss was old. (Tr. 125-26, June 10, 2013). According to Encinares, Defendant seemed "nervous," "worried," and "suspicious" upon taking the money. (Tr. 128, June 10, 2013). At some point, Defendant expressed concern that law enforcement recently had been investigating home health care companies and doctors. (Tr. 131-32, June 10, 2013; Tr. 554, June 12, 2013; Govt Ex. June 8, 2011 Video). He also repeatedly sought reassurance from Encinares that the payments were not

being documented in a computer system and that Encinares was not talking about the payments or their meetings on the telephone. (Tr. 131-33, June 10, 2013). Federal agents searched Encinares and his vehicle after the meeting and did not find any contraband. (Tr. 312, June 11, 2013).

Federal agents Peter Theiler and Aaron Woodill interviewed Defendant on July 13, 2011. (Tr. 378, June 11, 2013; Tr. 493, June 12, 2013). During the interview, the agents showed Defendant a video recording of one of his recent meetings with Encinares. (Tr. 378, June 11, 2013). Agent Theiler testified that Defendant told the agents that he did not receive money from Encinares, whom he had not seen for a long time. (Tr. 378-79, June 11, 2013). Defendant testified that the agents never asked him whether he'd taken money from Encinares and denied telling them that he took money from Encinares. (Tr. 494-95, 497 June 12, 2013). Agent Theiler testified that Defendant told the agents that very few of his patients went to Grand. (*Id.*). Agent Theiler further testified that Defendant also said that he knew it was illegal to take money for patient referrals, (Tr. 379, June 11, 2013), and asked the agents what would happen to him if he were caught doing so. (Tr. 379-80, June 11, 2013).

## II.    Analysis & Conclusions of Law

### A.    The Elements of the Charged Offenses

#### 1.    Violation of the Anti-Kickback Statute

The indictment charges Defendant with six counts of violating the "Anti-Kickback Statute," 42 U.S.C. § 1320a-7b(b)(1)(A). The statute provides in pertinent part:

> [W]hoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
> in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program * * * shall be guilty

of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

Courts have distilled the statute into a three-element offense. To prove a defendant guilty, the Government must prove: (1) that the defendant knowingly and willfully solicited or received remuneration, directly or indirectly, overtly or covertly; (2) that in return, the defendant referred individuals to a person or entity for furnishing or arranging the furnishing of services; and (3) that payment for the individuals' services was made in whole or in part under a Federal health care program. See *United States v. Borrasi*, No. 06-cr-916-2 (N.D. Ill. Dkt. 146), *aff'd*, 639 F.3d 774, 782 (7th Cir. 2011) ("The trial court did not err in instructing the jury * * * *"); *United States v. Muoghalu*, No. 07-cr-750-2 (N.D. Ill. Dkt. 70); see also *United States v. LaHue*, 261 F.3d 993, 1003 n.33 (10th Cir. 2001); Manual of Model Criminal Jury Instructions for the District Courts of the Eighth Circuit 6.42.1320 (2013). As to Counts 37, 40, and 41, it is clear that the Government need not prove that Defendant had actual knowledge of the Anti-Kickback Statute or specific intent to violate it. 42 U.S.C. § 1320a-7b(h) (effective July 1, 2010); *United States v. St. Junius*, 739 F.3d 193, 210 (5th Cir. 2013) ("[T]he Government must prove that the defendant willfully committed an act that violated the Anti-Kickback Statute. As applied to [defendant], the Government was only required to prove that she willfully solicited or received money for referring Medicare patients to TRG."). The Court concludes that the Government's burden of proof on the intent element is the same on counts, 3, 5, and 17, all of which allege conduct that occurred prior to the July 1, 2010 effective date of 42 U.S.C. § 1320a-7b(h), because the Anti-Kickback Statute is not a complex or technical one, and § 1320a-7b(h) codified rather than changed the Government's burden. See *United States v. Ferrell*, 2013 WL 2636108, at *3 (N.D. Ill. June 12, 2013) (discussing state of the law prior to passage); *United States v. Wheeler*, 540 F.3d 683, 689-90 (7th Cir. 2008) (discussing meaning of "knowingly and

willfully" in various contexts); *United States v. Starks*, 157 F.3d 833, 837-39 (11th Cir. 1998); *United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998); *United States v. Jain*, 93 F.3d 436, 440-41 (8th Cir. 1996); *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 33 (1st Cir. 1989). Contra *The Hanlester Network v. Shalala*, 51 F.3d 1390, 1399-1400 (9th Cir. 1995). That is, the Government must prove that Defendant intended to engage in conduct that he knew was wrongful, though it need not prove that he was aware of the specific statutory provisions that he is alleged to have violated.

### 2. Conspiracy to Violate the Anti-Kickback Statute

The indictment also charges Defendant with conspiring to violate the Anti-Kickback Statute. See [1]. To satisfy its burden of showing that Defendant engaged in the alleged conspiracy, the Government must prove three elements beyond a reasonable doubt: (1) that the alleged conspiracy existed; (2) that Defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy; and (3) that one of the conspirators committed an overt act in an effort to advance the goal of the conspiracy. See 18 U.S.C. § 371; *United States v. Kruse*, 606 F.3d 404, 408 (7th Cir. 2010); Pattern Criminal Jury Instructions of the Seventh Circuit 5.08A (2012). Each of the six charges of violation of 42 U.S.C. § 1320a-7b(b)(1)(A) is designated as an overt act. See [1].

### B. The Sufficiency of the Indictment

In his reply brief in support of his motion for judgment of acquittal, Defendant contends for the first time that the indictment against him was constitutionally defective. See [122-1] at 23-25. The Court respectfully disagrees.

To comport with the requirements imposed by the Fifth and Sixth Amendments Constitution, an indictment must accomplish three functions: (1) state each element of each

crime charged; (2) provide adequate notice of the nature of the charges so as to enable the defendant to prepare his defense; and (3) allow the defendant to raise the judgment as a bar to future prosecutions for the same offense. *United States v. Fassnacht*, 332 F.3d 440, 444-45 (7th Cir. 2003). "The sufficiency of an indictment is to be reviewed practically, with a view to the indictment in its entirety, rather than in any 'hypertechnical manner.'" *Id.* at 445 (quoting *United States v. Smith*, 220 F.3d 300, 305 (7th Cir. 2000)).

Defendant contends that the indictment in this case fails this test because it "simply tracks the statutory language" of the alleged offenses and does not mention Medicare certification forms. [122-1] at 24. He asserts that absent these "minimal facts," the indictment "does not 'provide [the] means of pinning down the specific conduct at issue." *Id.* (quoting *Smith*, 230 F.3d at 305). As the Seventh Circuit explained in *Fassnacht*, although an indictment must "do more than recite the statutory elements, this does not mean that the government is required to provide 'every factual nugget necessary for conviction.'" *Fassnacht*, 332 F.3d at 445 (quoting *Smith*, 230 F.3d at 306). Here, as in *Fassnacht*, the indictment "did, in fact, provide a number of factual details to which [Defendant] could have looked to determine the conduct on which the government intended to rely." *Id.* The indictment enumerates the dates on which the alleged statutory violations occurred, as well as the amounts of the kickbacks that Defendant allegedly received. See [1]. It further outlines the scope of the alleged conspiracy, its alleged members, and its purposes, "to knowingly and willfully offer and pay kickbacks * * * to induce the referral of patients to Grand for the furnishing of home health care services," and "to knowingly and willfully solicit and receive kickbacks * * * in return for the referral of patients to Grand for the furnishing of home health care services." See *id.* This information is sufficient to enable Defendant to identify the conduct on which the Government intended to base its case; "[t]he

defendant's constitutional right is to know the offense with which he is charged, not to know the details of how it will be proved." *Fassnacht*, 332 F.3d at 446 (quoting *United States v. Kendall*, 665 F.2d 126, 135 (7th Cir. 1981)). Unlike the indictment found defective in *United States v. Hinkle*, 637 F.3d 1154 (7th Cir. 1981), which failed to allege which controlled substances defendant was charged with facilitating the manufacture or distribution of and was devoid of any allegations as to the types of acts she allegedly facilitated, the indictment here adequately apprised Defendant of the "gravamen of the alleged offense." *Hinkle*, 637 F.2d at 1158. Indeed, Defendant in fact was prepared enough to meet the indictment that counsel indicated his intent to move for a judgment of acquittal during his opening statement. See (Tr. 14-16, June 10, 2013).

**C.      The Meaning of "Refer"**

The primary dispute in this case is whether the Government proved that Defendant "referred" patients to Grand within the meaning of the Anti-Kickback Statute. The Government asserts that Defendant's signing of the initial and recertification Form 485s constitutes "referring" within the meaning of the Anti-Kickback Statute. See generally [120-1]. Defendant contends that the word "referring" means personally recommending to a patient that he or she seek care from a particular entity, and that he cannot be guilty of the charged crimes because the Government put forth no evidence that he made any such personal recommendations. See generally [112]; [122-1].

The Anti-Kickback Statute uses but does not define the term "referring." See 42 U.S.C. § 1320a-7(b). The parties' dispute over the meaning of the term thus boils down to a question of statutory interpretation. "When interpreting statutes, first and foremost, we give words their plain meaning unless doing so would frustrate the overall purpose of the statutory scheme, lead to absurd results, or contravene clearly expressed legislative intent." *United States v. Vallery*,

437 F.3d 626, 630 (7th Cir. 2006). Even if Defendant's proposed narrow definition of "referring" were the term's plain and ordinary meaning, interpreting the term "referring" as Defendant advocates would frustrate the overall purpose of the statutory scheme, lead to absurd results, and contravene clearly expressed legislative intent.

As Defendant points out, the overarching purpose of the statutory scheme of which the Anti-Kickback Statute is a part is to "prevent[] inappropriate financial considerations from influencing the amount, type, cost, or selection of the provider of medical care received by a federal health care program beneficiary." [122-1] at 5 (quoting Thomas N. Bulleit, Jr. & Joan H. Krause, *Kickbacks, Courtesies or Cost-Effectiveness?: Application of the Medicare Antikickback Law to the Marketing and Promotional Practices of Drug and Medical Device Manufacturers*, 54 Food & Drug L.J. 279, 282 (1999)). The Seventh Circuit has echoed this sentiment, explaining that the Anti-Kickback Statute is "designed to help combat health care fraud," *United States v. Borrasi*, 639 F.3d 774, 781 (7th Cir. 2011), and noting that "among the evils Congress sought to prevent by enacting the kickback statues" were "[t]he potential for increased costs to the Medicare-Medicaid system and misapplication of federal funds," as well as the improper addition of kickbacks to the "legitimate costs" of medical transactions. *United States v. Hancock*, 604 F.2d 999, 1001 (7th Cir. 1979) (discussing predecessor versions of 42 U.S.C. § 1320a-7b); see also *United States v. Ruttenberg*, 625 F.2d 173, 177 (7th Cir. 1980) ("Whether costs were directly and immediately increased by those particular payments, however, is irrelevant. The potential for increased costs if such 'fee' arrangements become an established and accepted method of business is clearly an evil with which the court was concerned and one Congress sought to avoid in enacting [§ 1320a-7b's predecessor,] § 1396h(b)(1).").

The statutory scheme was enacted and refined to "strengthen the capability of the

Government to detect, prosecute, and punish fraudulent activities under the medicare and medicaid programs," H.R. Rep. 95-393(II), 95th Cong., 1st Sess. 53 (1977), *reprinted in* 1979 U.S.C.C.A.N. 3039, 3040 (1979), after Congress concluded "that there exist, to a disturbing degree, fraudulent and abusive practices associated with the provision of health services financed by the medicare and medicaid programs, * * * a broad range of improper activities which are not restricted to one particular class of providers or treatment settings." *Id.* at 3047. It is, in other words, a sweeping statutory scheme aimed at a wide range of conduct. It likewise is a scheme of inclusion rather than exclusion; Congress specifically directed the Secretary of Health and Human Services, in consultation with the Attorney General, to "promulgate final regulations, specifying payment practices that shall not be treated as a criminal offense under * * * [§ 1320a-7b(b)]." Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93, § 14 ("Standards for Anti-Kickback Provisions"), 101 Stat. 697 (1987). Those regulations – which do not explicitly de-criminalize the sort of arrangement at issue here – specifically note that § 1320a-7b(b) "is extremely broad." 56 Fed. Reg. 35952, 35952 (July 29, 1991).

Narrowly construing the term "referring" to mean only "personally directing a patient to a particular entity" is at odds with the broad nature of the statute. It also runs contrary to the Seventh Circuit's broad reading of the term "referring" in the very same statutory provision. In *United States v. Polin*, the Seventh Circuit rejected the defendant's attempt to "obfuscate the purpose and meaning of the [Medicare Anti-Kickback] Act" by "splitting hairs" between the provision prohibiting "recommending" and the provision prohibiting "referring." *United States v. Polin*, 194 F.3d 863, 866 (7th Cir. 1999). The court characterized as "apt" the Government's summation that "[r]efer is to recommend, is to turn over, is to make a selection, is to give the business away." *Id.* This multi-faceted definition of the term "refer" incorporates Defendant's

proposed definition – to recommend and to make a selection – but also goes beyond it to include more expansive types of conduct, like "turn[ing] over" and "giv[ing] the business away." Signing one's name to required forms and certifying the necessity and propriety of proposed treatment may not constitute affirmative recommendation or selection, but these actions are part and parcel of "giv[ing] the business away" and "turn[ing] over" a patient to a home health care company for as long as the relationship requiring periodic recertification continues. Consistent with this interpretation, at least two other courts have suggested that prescribing or "formally authoriz[ing] a particular service" falls comfortably within the meaning of the term "refer" as it is used in the Anti-Kickback Statute. *United States v. Rogan*, 459 F. Supp. 2d 692, 714 (N.D. Ill. 2006), *aff'd*, 517 F.3d 449 (7th Cir. 2008); see also *United States v. Vernon*, 723 F.3d 1234, 1254 (11th Cir. 2013) ("[T]he plain language of the statute *is not limited to* payments to physicians who prescribe medications." (emphasis added)).

The Court finds these cases persuasive, particularly to the extent that Defendant's patients could not initiate or continue treatment from Grand on their own; without Defendant's authorization and certification, the patients could not receive treatment from Grand, regardless of their preferences. Even if Defendant had nothing to do with a patient's decision to choose Grand in the first instance, his signature on the Medicare-required forms not only confirmed the patient's decision to go to Grand but also placed his imprimatur on the need for services that would be billed to and paid for by Medicare. By signing the forms, Defendant approved the course of treatment designed and prepared by Grand, thereby informing payor Medicare that the treatment was necessary and should be reimbursed – he was a financial gatekeeper as well as a medical one. Unlike the defendant in *United States v. Miles*, 360 F.3d 472, 480-81 (5th Cir. 2004), Defendant was a "relevant decisionmaker" when he acted in this gatekeeping capacity.

See *Ruttenberg*, 625 F.2d at 177 ("The potential for increased costs if such 'fee' arrangements become an established and accepted method of business is clearly an evil with which the court was concerned and one Congress sought to avoid in enacting [§ 1320a-7b's predecessor,] § 1396h(b)(1)."). From this perspective, a patient referral appropriately is considered synonymous with the paperwork required to effectuate it, regardless of the specific words used to describe the relationship. Contra [161] at 5.

Defendant's proposed definition of "referring" also would lead to absurd results. Under his proposed definition, physicians would be free to accept kickbacks each time they recertified a patient for treatment by a previously selected home health care provider. The Eleventh Circuit recently rejected this anomaly in *United States v. Vernon*, 723 F.3d 1234 (11th Cir. 2013).[3] In *Vernon*, the defendant contended that payments he accepted in connection with patients who had already chosen a particular pharmaceutical provider, Medfusion, were not criminal under the Anti-Kickback Statute because "a patient could only be 'referred' to Medfusion if he was not already a Medfusion customer." *Vernon*, 723 F.3d at 1255. The Eleventh Circuit concluded that the payments at issue "were made for the continuing referral of these patients," who did not have contracts that required them to fill their prescriptions at Medfusion. *Id.* The court further explained that, as here, adopting the defendant's argument "would lead to the absurd result that the first kickback payment for a referral is unlawful, but future kickback payments for the same patient are lawful because they are not for an initial 'referral.'" *Id.* at 1256. If "referring" were construed as narrowly as Defendant advocates, the same anomalous result would occur here. So too could a doctor who is fully aware of a provider's desire to increase its number of patients by offering payments accept these payments with impunity by ensuring that he or she never

---

[3] The Eleventh Circuit issued its opinion in *Vernon* after the conclusion of Defendant's trial. The Court requested [152] and received [155, 156, 160, 161] supplemental briefing on *Vernon* from the parties.

personally told a patient to go to a particular provider.  To reach the alternative conclusion here would, in the words of the Eleventh Circuit, "graft * * * a counterintuitive principle onto the Anti-Kickback statute," *Vernon*, 723 F.3d at 1256, and, moreover, would run counter to the generally accepted principle that "the government need not show that one accepting a payment for an illegal purpose actually carried through on his promise." *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.*, 874 F.2d 20, 34 (1st Cir. 1989); *cf. United States v. Picciotti*, 40 F. Supp. 2d 242, 248 (D.N.J. 1999) ("Moreover, the Government need not prove that Leon SCD actually received referrals, but merely that Dr. Picciotti solicited or received payments as an inducement, that is, as encouragement, to refer patients to Leon SCD.  In other words, the Government need only prove that the money was paid in exchange for the promise of referrals. It need not prove that Dr. Picciotti actually produced those referrals.").

Defendant relies heavily on *United States ex rel. Perales v. St. Margaret's Hospital*, 243 F. Supp. 2d 843 (C.D. Ill. 2003), for the opposite proposition – that to reject his definition of "referring" would lead to absurd results.  In *Perales*, a civil False Claims Act case, relator Perales alleged that his contract with defendant hospital violated the Anti-Kickback Statute because it contained an improper inducement aimed at boosting referrals.  The court rejected his claims at summary judgment because none of them was timely.  *Perales*, 243 F. Supp. 2d at 853.  As an alternative ground for its ruling, the court concluded that Perales failed to demonstrate the filing of a false claim because he, by his own admission, "played no role in determining which facility a patient would go to for the services he prescribed."  *Id.*  The court went on:

> If Perales' interpretation were correct, a physician could find himself criminally liable for the actions of another person where he did nothing more than write up a generic order for services that could have been performed anywhere in the country or simply because a patient took an order for services that the physician prepared and went to SMH completely of the patient's own accord.  This result would be absurd, and the new Stark regulations will contain an exception for

> indirect referrals. * * * * Clearly, both [the Stark Amendment and the Anti-Kickback Statute] contemplate that the person receiving the inducement is the one who is prohibited from making the referral to the entity that offered the remuneration. The fact that some of the patients that he attended may have received services at SMH either by their own choice or after consultation with Thompson does not meet this standard.

*Id.* at 854 (citations omitted).[4] The Court agrees that the imposition of criminal liability in the situation described in *Perales* would be absurd. But it does not agree that *Perales* is controlling or even persuasive in this case, or that it mandates Defendant's narrow interpretation of "referral." Critical to the court's (alternative) conclusion in *Perales* was the fact that Perales "did nothing more than write up a generic order for services." Under the definition proposed by Defendant, by contrast, a physician could do much more without facing liability, notwithstanding the clear congressional intent to the contrary. As here, one could "write up a generic order" – the prescription for home health care services – then reach out to a provider, permit the provider to assess the patient and develop a plan of care, then approve that plan, possibly more than once, all with financial incentives greasing the wheels, and all with impunity. The Court respectfully concludes that such an interpretation is neither consistent with *Perales* nor with the intent of the Anti-Kickback Statute.

As the foregoing discussion indicates, the Court cannot accept either Defendant's proposed statutory construction or his alternative contention that because there are two equally

---

[4] The Stark Amendment to the Medicare Act, 42 U.S.C. § 1395nn, is a civil statute that "forbids payment of any claim that arise from medical services rendered to a patient who had been referred improperly." *United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008). Stark, like the Anti-Kickback Act, "is part of the broader regulatory scheme for Medicare and Medicaid." *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 939 n.2 (11th Cir. 2013). It was enacted "to address perceived overutilization of services by physicians who stood to profit by referring patients to facilities or entities in which they had a financial interest." *Council for Urological Interests v. Sebelius*, 668 F.3d 704, 705 (D.C. Cir. 2011). Regulations interpreting the Stark Amendment define "referral" to include "the request by a physician for, or ordering of, or *the certifying or recertifying the need for*, any designated health service for which payment may be made under Medicare Part B." 42 C.F.R. § 411.351 (emphasis added). The Court finds this definition instructive.

plausible interpretations of the applicable statute, "the tie must go to the defendant." See *United States v. Santos*, 553 U.S. 507, 514 (2008); *United States v. Taylor*, 640 F.3d 255, 259-60 (7th Cir. 2011). Simply put, the Court is not persuaded that construing the term "referring" to include not only express recommendations but also the acts of signing forms and (re)certifying plans of treatment prepared by a home health agency violates the rule of lenity or otherwise risks blindsiding innocent physicians. In that regard, it is worth noting that the Office of Inspector General ("OIG"), which is tasked with reducing fraud in federal Health and Human Services programs, long ago provided "fair warning" to physicians dealing with home health care agencies that accepting payments for certifying plans of care may subject them to criminal liability. In a "Special Fraud Alert" issued in 1995,[5] the OIG identified home health care as "particularly vulnerable to fraud and abuse." 60 Fed. Reg. 40847, 40847 (Aug. 10, 1995). The OIG specifically identified as a form of prohibited kickback "[p]ayment of a fee to a physician for each plan of care certified by the physician on behalf of the home health agency." *Id.* at 40848. The OIG also underscored the importance of physicians' gatekeeping functions, noting that physicians who order or approve "unnecessary home health care services" – which is more likely to happen if the physician is getting paid when he or she signs off on the plans of care – "may be liable for causing false claims to be submitted by the home health agency, even though the physician does not submit the claim." *Id.* Indeed, the potential for increased costs to the Medicare system is particularly acute where a medical service provider that gets paid per service rendered is responsible for proposing plans of care, and the gatekeeping physician tasked with certifying the legitimacy of the plans and the necessity of the proposed services is given remuneration each time he approves or reapproves a plan. Whether the physician's judgment is

---

[5] Defendant relies on a different Special Fraud Alert in his briefings, suggesting that he too considers them persuasive if not binding guidance. See [122-1] at 5-6.

actually compromised or costs to Medicare are actually increased in a particular instance is irrelevant; the point of the statutory scheme is to prevent abuses of the Medicare payment system and preserve the integrity of physicians' medical judgment.

For all of these reasons, the Court respectfully rejects Defendant's narrow interpretation of the word "referring" and concludes that "referring" as used in the Anti-Kickback Statute encompasses more than personally directing a patient to a facility or provider. Specifically, the Court concludes that the act of certifying or recertifying a patient for home health care services by signing a Form 485 falls within the term's meaning.

### D. Defendant's Liability

#### 1. Defendant Violated the Anti-Kickback Statute

Applying the foregoing definition of "referring," and in light of the facts found and law outlined above, the Court concludes that Defendant knowingly and willfully received illegal remuneration in return for referring patients to Grand as alleged in Counts 37, 40, and 41 of the indictment. The facts as found above establish beyond a reasonable doubt that Defendant knowingly and willfully solicited or received remuneration in return for referring patients to Grand on or about April 5, 2011 (Count 37), May 16, 2011 (Count 40), and June 8, 2011 (Count 41), and that payment for the individuals' services was made in whole or in part under a Federal health care program. As to these counts, the videotapes that the Government introduced at trial strongly confirmed the Defendant's consciousness of guilt and the link between the Medicare "paperwork" that he signed and the payments that he accepted. In short, Defendant knew both that (1) his patients were receiving home health care services from Grand and (2) Grand was paying him money for every patient that he certified or recertified. In other words, the "paperwork" that Defendant signed was not a "generic order for services" that his patients could

25

take anywhere they pleased; rather, it was an order for specific services with a specific provider – one that was paying a specific sum to Defendant for each document that he signed.

The facts as found above also demonstrate that Defendant is guilty of Counts 3 and 17, which respectively allege that he violated 42 U.S.C. § 1320a-7b(b)(1)(A) on or about September 26, 2007 and June 9, 2010. The meticulous notations in Buendia's notebook, coupled with her testimony and that of Encinares and Defendant, demonstrate that the payments made to Defendant on September 26, 2007, and June 1, 2010, also were in return for his completion of Form 485s that facilitated reimbursement under a federal health care program. The trial testimony establishes that payments were made to Defendant on or about those dates and that he was nervous about accepting the money then, as he was on every occasion that he accepted money from Encinares. And, as with Counts 37, 40, and 41, the parties stipulate that Medicare is a federal health care program. These facts establish, beyond a reasonable doubt, that Defendant violated 42 U.S.C. § 1320a-7b(b)(1)(A) on or about September 26, 2007 and June 9, 2010.[6]

Although Buendia's notebooks lack precise notations breaking down into their component parts the payment that Defendant received on or about March 11, 2008, the Court concludes in light of the testimony adduced at trial that there can be no reasonable doubt that the payment Defendant admittedly received on that date was for anything other than completing Form 485s. And by signing these Medicare-required forms, Defendant effectuated or recertified patients' admissions to Grand and ensured that Grand would be paid by Medicare. Accordingly, the Court concludes that Defendant is guilty of the charge in Count 17 as well.

---

[6] The Court finds immaterial the discrepancy between the June 1, 2010 notation in Buendia's notebook and the date of "on or about June 9, 2010" charged in Count 17 of the indictment. Encinares paid Defendant the money noted in Buendia's notebook in exchange for completing Form 485s, and June 1, 2010 is reasonably close to June 9, 2010. See Pattern Criminal Jury Instructions of the Seventh Circuit 4.05 (2012).

### 2.     Defendant Conspired to Violate the Anti-Kickback Statute

Count 1 of the indictment alleges that Defendant and others conspired in a scheme to pay and receive kickbacks in connection with the referral of patients to Grand.  See [1].  As to Defendant, it specifically alleges that "in or about May 2006 through in or about February 2011, defendants ENCINARES and BUENDIA paid defendant PATEL at least approximately $28,500 in cash kickbacks in exchange for the referral of Medicare-eligible patients to Grand."  *Id.*  To satisfy its burden of showing that Defendant engaged in the alleged conspiracy, the Government must prove beyond a reasonable doubt (1) that the alleged conspiracy existed; (2) that Defendant knowingly became a member of the conspiracy with an intent to advance the conspiracy; and (3) that one of the conspirators committed an overt act in an effort to advance the goal of the conspiracy.  See 18 U.S.C. § 371; *United States v. Kruse*, 606 F.3d 404, 408 (7th Cir. 2010); Pattern Criminal Jury Instructions of the Seventh Circuit 5.08A (2012).  The Court notes that the conduct alleged in Counts 37, 40, and 41 is beyond the scope of the conspiracy not only chronologically but also as a matter of law.  See *United States v. Contreras*, 249 F.3d 595, 599 (7th Cir. 2001) (explaining that there cannot be a meeting of the minds between participants in an alleged conspiracy when one of them is acting as a government informant).

The facts found above establish beyond a reasonable doubt that the alleged conspiracy "to knowingly and willfully offer and pay kickbacks * * * to induce the referral of patients to Grand for the furnishing of home health care services," and "to knowingly and willfully solicit and receive kickbacks * * * in return for the referral of patients to Grand for the furnishing of home health care services" existed.  They also establish that Defendant knowingly agreed to join the conspiracy.  As indicated above, the Court found credible Buendia's and Encinares' testimony that they made clear to Defendant their offer to join the scheme by accepting monetary

payments in exchange for "referrals" to Grand. Although the Court has accepted Defendant's version of the initial conversation in which the offer was transmitted – namely, that he was noncommittal at that time – Defendant's subsequent affirmative actions, namely his ongoing and regular acceptance of monetary payments from Encinares and repayment of a loan by forgoing them, show that soon thereafter he knowingly acquiesced in the scheme and its objectives. This is sufficient to establish the requisite "meeting of the minds." See *United States v. King*, 627 F.3d 641, 652 (7th Cir. 2010). The Government has satisfied its burden of proving an overt act by proving that Defendant violated 42 U.S.C. § 1320a-7b(b)(1)(A) as alleged in Counts 3, 5, and 17. To carry its burden that Defendant committed these acts "in an effort to advance the goal of the conspiracy," the Government "must prove at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Caira*, 737 F.3d 455, 463-64 (7th Cir. 2013) (quoting *United States v. Feola*, 420 U.S. 671, 686 (1975)). Here, the Government did so: the facts adduced at trial demonstrate that Defendant intended to receive money in exchange for certifying and recertifying patients for Grand. The fact that relatively few of Defendant's patients used Grand does not, as Defendant suggests, see [122-1] at 22-23, necessarily demonstrate a lack of intent on his part; the evidence showed that after Defendant agreed to join the conspiracy, there was an uptick in the number of his patients that went to Grand and the consistency with which they did so. The Government need not prove that the number or frequency of referrals crossed a certain threshold to satisfy its burden of demonstrating intent.

### E.     Defendant's Motion for Judgment of Acquittal

Defendant moved for a judgment of acquittal on all counts. See [111]. Rule 29(a) provides that, "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which

the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When, as here, a defendant makes a Rule 29(a) motion at the close of the Government's case, and the Court reserves decision, the court "must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b). The question the Court must ask is whether a reasonable fact-finder, considering the evidence in the light most favorable to the Government, could find each element of the offense beyond a reasonable doubt. *United States v. Jones*, 713 F.3d 335, 340 (7th Cir. 2013).

Here, the Court found Defendant guilty of the charges against him without considering the facts in the light most favorable to the Government. Accordingly, the motion for judgment of acquittal [111] must be and is denied.

## III.  Conclusion

For the reasons stated above, the Court concludes that the Government's evidence is sufficient to sustain convictions on Counts 1, 3, 5, 17, 37, 40, and 41 of the indictment. This matter is set for status on March 14, 2014 at 10:00 a.m.


Dated: February 19, 2014

_____
Robert M. Dow, Jr.
United States District Judge